IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSEANNE SAKAMOTO, | No. C 03-05499 SI |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PARTIALLY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| STEPHEN JOHNSON and U.S. ENVIRONMENTAL PROTECTION AGENCY, | |
| Defendants. | |

On March 24, 2006, the Court heard oral argument on cross-motions for summary judgment. Having carefully considered the papers submitted and the arguments of counsel, the Court hereby PARTIALLY GRANTS defendant's motion and DENIES plaintiff's motion for the reasons set forth below.

**BACKGROUND**

Plaintiff Roseanne Sakamoto, a Japanese-American woman, filed suit in 2003 against her employer, the Environmental Protection Agency ("EPA"), and EPA administrator Stephen L. Johnson,[1] alleging discrimination, retaliation, and violation of the Equal Pay Act. The crux of her complaint is the allegation that her promotion to the GS-12 and GS-13 pay levels was prolonged and delayed due to unlawful discrimination against her by her supervisor, Vance Fong, a male of Chinese and Vietnamese

---

[1] Johnson was substituted for his predecessor, Michael Leavitt, as a defendant on December 1, 2005.

descent, who she also claims retaliated against her for filing EEOC complaints against him.

Sakamoto began working at the EPA in 1989 as a GS-7 Environmental Protection Specialist in the Quality Assurance Office ("QA Office"), and was promoted twice until she was working at the GS-11 level by April 1991. Sakamoto Dep. at 31:15-18, 57:17-58:14. Her supervisor from 1989 to 1994, Ken Kitchingman, did not promote her to the GS-12 level, the next and highest level available for her position. *Id.* at 63:24-64:1, 87:1-6. Vance Fong began supervising Sakamoto in October 1994, and promoted her to the GS-12 level in 1997. *Id.* at 76:7-20. Sakamoto claims that Fong told her that the GS-12 promotion was delayed due to discriminatory feelings against her by Fong's immediate supervisor, Terry Stumph. Sakamoto Decl. ¶ 11.

Sakamoto requested Fong to consider her for GS-13 classification in August 1998, based on her belief that her duties and responsibilities justified a promotion based on "accretion of duties." Sakamoto Dep. at 87:7-15. Such a promotion can occur when an employee's responsibilities change over time to include at least 25% of the duties and responsibilities of a higher position. Fish Dep. at 45:5-7. She was turned down, and was turned down repeatedly over the next year when she broached the subject. Sakamoto Dep. at 87:11-14, 105:2-17. The EPA conducted a desk audit in September 1999, which consisted of interviews of Sakamoto and Fong to determine the nature and breadth of her duties and responsibilities. The auditor determined that Sakamoto was working at the GS-12 level. *Id.* at 196:1-7. After completion of additional special assignments over the next two years, Sakamoto was promoted to the GS-13 level in December 2001.

Sakamoto filed two EEOC complaints prior to filing this action, and filed a third EEOC complaint after filing this action. The first complaint, dated November 30, 1999, alleged discrimination on the basis of race, national origin, and sex, as well as reprisal. *See* Pl. Ex. 17. The basis for these allegations was that Fong supposedly acknowledged that she was working at the GS-13 level, but would not promote her due to his biases. Specifically, Sakamoto alleged that Fong told her that his Chinese heritage had instilled in him the view that women were of little value, and that he had higher expectations of her than of other employees. She also alleged that Fong promoted and praised male co-workers while he relegated her to a secondary role and ignored her contributions, and that he made comments that denigrated her. *See id.* The complaint also alleged that Fong threatened her with regards

2

1 to her seeking help from her union. Finally, the complaint alleged that Fong engaged in reprisal against 2 Sakamoto by improperly influencing the desk audit so that it would result in a finding that she was 3 working at the GS-12 level, as well as by over-scrutinizing her work, not noting her accomplishments 4 on performance reviews, and generally making her feel unwelcome in the office. *See id.*

5 The second EEOC complaint, dated October 10, 2003, added the allegation that Fong's 6 retaliation and continued discrimination against her now included an illegitimate refusal of her request 7 to work "credit hours" (in which she would work extra hours that could later be used as vacation) from 8 June 16, 2003 until July 19, 2003, and that he wrote negative statements on her performance review due 9 to this request. *See id.* The second complaint also alleged that Fong retaliated in response to her prior 10 EEOC complaint through extra scrutiny of her work and an increase of her workload relative to that of 11 her co-workers. *See* Pl. Ex. 17.

12 The third EEOC complaint was filed on October 29, 2004, after Fong's deposition in this case, 13 and described an incident in which Fong asked her to remove a cart from her cubicle, calling it a fire 14 hazard. Sakamoto alleged that this request constituted selective enforcement, and was a pretext for 15 discrimination and retaliation. *See id.* It also described another incident several days later in which 16 Fong entered her cubicle and stood in her "personal space" while smiling and citing his right to stand 17 in her cubicle, leaving only when Sakamoto mentioned her union. *See id.* The third complaint also 18 claimed that Fong had again refused Sakamoto's request to work credit hours, and that he had asked for 19 an hour-by-hour accounting of her work day. *See id.* It also alleged that she was issued an official 20 written reprimand for failure to follow procedure in requesting leave and failure to follow instructions 21 in connection with a November 15, 2004 meeting regarding her credit hours request with Fong and Tom 22 Huetteman, Deputy Director of the Policy and Management division. *See id.* Finally, the third 23 complaint alleged that her union's vice president, Mark Sims, experienced retaliation for trying to help 24 her, that Sakamoto received a coercive letter from Jane Diamond, Assistant Regional Administrator, that 25 instructed her to stop making claims against Fong, and that Fong had again retaliated through negative 26 comments in her performance review. *See id.* Fong left the QA Office in January 2005, and no longer 27 supervises Sakamoto. Fong Decl. ¶ 12.

28 Overall, plaintiff has raised serious questions of racial and gender bias in her workplace. While

3

1   the potential for significant monetary recovery does not appear to be high due to the lack of substantial
2   economic damage, the submitted papers make clear that, if nothing else, plaintiff's working life was
3   impacted by the degradation in her relationship with her supervisor.  If motivated by discriminatory
4   animus, the actions attributed to the employer in this case are condemnable.

5   Sakamoto's Title VII and Equal Pay Act causes of action are based on the allegations previously
6   made in her EEOC complaints.  Her complaint also claims improper withholding of information
7   requested under the Freedom of Information Act ("FOIA"), based on her allegation that the EPA has
8   not fully responded to one of her FOIA requests. Sakamoto Decl. ¶ 46.  Now before the Court are cross-
9   motions for summary judgment.

## LEGAL STANDARD

### I.   Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial.  The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *See Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn

4

in its favor. *See id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*.

## II.     Employment Discrimination

A plaintiff may make a *prima facie* case of discrimination through direct or circumstantial evidence. *See Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997). A plaintiff may also create an inference of unlawful discrimination through meeting the four requirements outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Once a plaintiff meets this burden of production, the employer must offer a legitimate, nondiscriminatory reason for the adverse employment decision. *See Reeves v. Sanderson Plumbing Product, Inc*., 530 U.S. 133 (2000); *Collings v. Longview Fibre Co*., 63 F.3d 828, 833-34 (9th Cir. 1995); *Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir. 1990). If the employer meets this burden, then the plaintiff must produce "specific, substantial evidence" that the proffered reason is pretextual. *Collings*, 63 F.3d at 834 (citation and internal quotation marks omitted). The plaintiff bears the ultimate burden of establishing that she has been discriminated against on a prohibited basis. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11 (1993). However, the trier of fact may infer the existence of a discriminatory motive from the plaintiff's proof that the employer's proffered explanation is false. *See Reeves*, 530 U.S. at 147.

## DISCUSSION

## I.     Admissibility of Plaintiff's Papers

As a threshold matter, the Court will address several arguments made by defendants in their reply brief concerning plaintiff's opposition papers. Defendants first urge the Court to strike plaintiff's declaration for failure to comply with Local Rule 7-5, which provides that a declaration may contain only facts, and must avoid conclusion and argument. N.D. Local Rule 7-5(b). The Court declines to do so. Plaintiff's declaration, entitled "Declaration of Roseanne Sakamoto in Support of Her Opposition to Motion for Summary Judgment with Points and Authorities," does contain a great deal of argument and citation of case law, and even includes a table of authorities. However, the Court believes that

5

substantial flexibility is warranted here due to plaintiff's *pro se* status. For this reason, the Court also declines to find that plaintiff's opposition fails due to forcing the Court to scour the record. While plaintiff's opposition papers are voluminous, her brief and declaration outline her arguments and cite to her eighty-nine exhibits with a level of clarity and organization that, while far from ideal, is sufficient for consideration.

The Court also cannot accept defendants' argument that they were prejudiced by plaintiff's failure to comply with Local Rule 5-5 that requires that opposing counsel be served with papers on the same day they are filed with the Court, except that papers served by mail must be mailed three days before the filing date. N.D. Local Rule 5-5. The EPA asserts a failure to comply with the rule because plaintiff served her papers by mail, and defendants did not receive the papers on the day they were filed with the Court. However, the rule requires that plaintiff mail her papers three days before filing, not that defendants actually receive them on the date of filing; defendants do not state when plaintiff's papers were postmarked. Finally, defendants' argument that plaintiff's opposition should fail on grounds of being replete with conclusory allegations unsupported by admissible evidence shall be taken up when discussing whether plaintiff has made a showing sufficient to overcome a summary judgment motion, not as an independent basis to strike her opposition papers.

While plaintiff's *pro se* status justifies leniency, the Court notes that she has repeatedly failed to follow the Local Rules throughout this case. As this case approaches trial, it is incumbent upon the plaintiff, and the Court hereby instructs her, to familiarize herself with the Local Rules for the Northern District and substantially comply with them to a much higher degree than she has thus far.

## II.     **Plaintiff's Motion for Summary Judgment**

While plaintiff's opposition to defendants' motion for summary judgment is sufficiently briefed, plaintiff's cross-motion for summary judgment is not. Its consideration would require the Court to scour plaintiff's papers in an effort to determine what her argument for summary judgment might be. *Cf. Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (finding no duty to examine the entire file for evidence establishing a material fact where such evidence is not adequately referred to in opposition papers). While plaintiff's brief is styled as both a "Statement of Genuine Issues in

1  Opposition to Motion for Summary Judgment" and "Plaintiff's Cross Motion for Summary Judgment,"
2  it is solely concerned with opposing the defendants' motion and contains no argument whatsoever on
3  why plaintiff is entitled to summary judgment in her favor. While pleadings and motions of a *pro se*
4  party are afforded more leniency than that accorded to a represented party, plaintiff's motion for
5  summary judgment does not provide even a minimal basis for the Court to consider summary judgment
6  in her favor. Accordingly, plaintiff's motion for summary judgment is denied.

**III.    Defendants' Motion for Summary Judgment**

Defendants move for summary judgment on grounds that Sakamoto fails to make a *prima facie* showing of unlawful discrimination since the EPA's treatment of her was not based on her race, national origin, or gender, and that she fails to make a *prima facie* case for retaliation because she cannot establish an adverse action or a causal link. Defendants also claim that she fails to make a *prima facie* case for either discrimination or retaliation since she cannot identify any similarly situated individuals who were treated differently. Furthermore, defendants claim that even if Sakamoto is found to have made the required *prima facie* showing, she cannot rebut the EPA's non-discriminatory explanations for its actions. Finally, defendants assert that the EPA has fully responded to Sakamoto's FOIA requests.

Sakamoto characterizes all of her claims as both discrimination and retaliation; the following analysis seeks to categorize each as one or the other.

**A.    Has Plaintiff Made a *Prima Facie* Showing of Unlawful Discrimination?**

The degree of proof necessary to establish a *prima facie* case of discrimination on summary judgment is low, not rising even to the level of a preponderance of the evidence. *See Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997). A plaintiff may make the required showing by presenting evidence of discriminatory intent, or by creating a presumption of unlawful discrimination by satisfying the *McDonnell Douglas* factors, which require the plaintiff to show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4)

1 similarly situated individuals outside her protected class were treated more favorably. *See Cordova* at 1148; *Chuang v. University of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Defendants claim that Sakamoto cannot show intent, and that she also fails to create a *McDonnell Douglas* presumption because she does not show that similarly situated individuals received more favorable treatment.

### 1. Discriminatory Intent

Sakamoto has submitted a declaration in which she describes an ongoing pattern of behavior in which Fong made her race, gender and national origin an issue. She alleges that Fong's greeting upon becoming her supervisor was a statement indicating that he hoped she would not think that he would mistreat her due to what the Japanese did to the Chinese in the war. Sakamoto Decl. ¶ 8. Sakamoto also claims that Fong would periodically bring up her Asian background by telling her that she should understand his actions because she is an Asian woman, and told her that he prefers to hire people with Asian spouses. *Id*. at ¶ 14. She also alleges that he once apologized for mistreating her by explaining that his Chinese heritage made him place a low value on women and take them for granted. *Id*. at ¶ 22. She additionally alleges sex discrimination due to Fong's alleged statement to her that consideration of her promotion was low priority because she does not have a family relying on her as male co-workers do. *Id*. at ¶ 21.

Sakamoto's showing of discriminatory intent is sufficient to constitute a *prima facie* case of unlawful discrimination. The statements she attributes to Fong, if true, constitute direct evidence of discriminatory animus based on race, national origin, and sex. Defendants do not deny that these statements were made, but instead say only that plaintiff is choosing to interpret the statements as showing discriminatory animus. The Court finds that the alleged statements, particularly the statement regarding the low value Fong assigns to women, are largely unambiguous and not readily susceptible to innocuous interpretations, and therefore cannot be characterized as "stray remarks." *See Cordova v. State Farm Ins. Co.*, 124 F.3d 1145, 1148-49 (9th Cir. 1997). While the evidence that Fong made these statements consists only of Sakamoto's assertions in her declaration, she need produce only

8

1 minimal evidence of improper motive to withstand summary judgment. *Lindahl v. Air France*, 930 F.3d 1434, 1438 (9th Cir. 1991). The alleged statements, and defendants' failure to rebut them, meet this minimal level of evidence. Since Sakamoto has created a presumption of discrimination through direct evidence of unlawful motive as to actions taken by Fong, she need not create an inference through the *McDonnell Douglas* factors on these claims.

Defendants also argue that plaintiff cannot overcome the "same actor" inference, which directs that a plaintiff must make a very strong showing of bias when bringing a claim against someone who has previously treated the plaintiff favorably. *See Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096-97 (9th Cir. 2005). In this case, Fong promoted plaintiff to the GS-12 level after her previous supervisor repeatedly refused to do so. There is thus a rebuttable presumption that Fong did not have a discriminatory motive in his future actions. While it is a close question, the Court finds that the statements attributed to Fong, which he does not deny making in either of his two declarations submitted in support of the instant motion, are enough to overcome the strong presumption created by the same actor inference at the summary judgment stage. The statements allegedly made by Fong are thus sufficient to create a rebuttable presumption of unlawful motive for all of plaintiff's claims on actions in which Fong played a role, including the failure to promote to the GS-12 and GS-13 levels, negative performance reviews, the desk audit, letter of reprimand, credit hours request, cart removal, excessive scrutiny, and increased workload. The only claims for which the statements do not suffice to create a *prima facie* case are those relating to discrimination by Terry Stumph, alleged intimidation of Mark Sims, and the letter from Jane Diamond, discussed below.

9

///

### 2.     Inference of Unlawful Discrimination

Defendants claim that Sakamoto has not shown that any similarly situated person was treated more favorably with regard to any of the actions underlying her claims, as required to create a presumption of discrimination through inference under *McDonnell Douglas*. The claim regarding Stumph's delay of her promotion to the GS-12 level must meet this test, while the remainder of the claims are addressed *infra* as retaliation claims.

Sakamoto's claim regarding Stumph allegedly delaying her promotion to the GS-12 level fails under the *McDonnell Douglas* test as she has not shown that similarly situated individuals were treated more favorably. Even assuming that she was qualified for the position during the period in which Stumph allegedly prevented her promotion due to bias, she has not submitted any evidence that similarly situated individuals were treated differently by him with regard to promotion to the GS-12 level. Plaintiff thus fails to make a *prima facie* case of discrimination by Stumph with regard to her promotion to the GS-12 level. The Court grants summary judgment to defendants on this aspect of Sakamoto's complaint.

It should be noted that Sakamoto's claim on the GS-12 promotion survives with regard to discrimination by Fong. Fong's alleged statement to plaintiff that he thought she was qualified for the GS-12 promotion but that Stumph's discrimination stood in the way is belied by the allegation that, even after Stumph left, Fong only promoted Sakamoto after she told him of her plan to invoke a union contract provision that would require him to explain to her why she had not been promoted. Sakamoto Decl. ¶ 12; Pl. Ex. 23. It is also belied by all of the unrebutted statements by Fong indicating bias.

### B.     Has Plaintiff Made a *Prima Facie* Showing of Retaliation?

Plaintiff claims that the letter from Jane Diamond and the alleged retaliation against Mark Sims constitute retaliation against her. Establishing a *prima facie* case of retaliation requires the employee to show that she (1) engaged in protected activity, (2) was subjected to an adverse employer action, and (3) a causal link exists between the protected activity and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). The Ninth Circuit takes an expansive view of what constitutes an

1  adverse employment action, and has held that the action need not rise to the level of something that
2  materially affects the terms and conditions of employment. *See id*. at 1240-42. The standard is instead
3  an "action that is reasonably likely to deter employees from engaging in protected activity." *Id*. at 1243.
4  Defendants argue that the actions taken do not rise to the level of an adverse employment action, and
5  that there is any case no causal link.

### 1. Letter From Jane Diamond

The letter from Diamond was sent in response to a Violence in the Workplace Incident Report in which Sakamoto alleged that Fong entered her cubicle on October 29, 2004, and physically intimidated her with his presence. *See* Pl. Ex. 80. This incident report also re-alleged past accusations against Fong made by Sakamoto. Diamond's letter explained why Diamond did not find Sakamoto's complaint regarding Fong's entry into her cubicle credible. It also noted that her prior complaints were adjudicated in favor of Fong either through management investigation, the EEOC, or the Office of the Inspector General. It concluded by ordering Sakamoto to "cease from reasserting these baseless claims against Mr. Fong," and told her that she could report any new violations not already addressed to appropriate personnel, including management, her union, and an EEO counselor. *See id*.

The language of the letter from Diamond in which she ordered the plaintiff to "cease from reasserting these baseless claims against Mr. Fong" does not qualify as an adverse employment action. Pl. Ex. 80 at 3. Diamond only told Sakamoto not to re-file allegations that had already been adjudicated through prior complaints and investigations; the filing of such complaints is not a protected activity. The filing of a complaint that contains allegations that have not previously been dealt with does constitute a protected activity, and Diamond specifically informed Sakamoto that she could do this for any new allegations of misconduct. *See id*. As it seeks to deter unprotected activity while affirming the right to engage in protected activity, the letter does not constitute an adverse action that would cause plaintiff to stop engaging in protected activity. Accordingly, the Court finds that plaintiff has not made a *prima facie* case of retaliation regarding the letter from Jane Diamond.

### 2. Retaliation Against Mark Sims

11

1      Plaintiff claims that Sims received negative comments from his supervisor on his 2005
2 performance review and was told to comply with time-reporting requirements after he had helped
3 Sakamoto by writing an affidavit on her behalf. Sakamoto Decl. ¶ 97-101; Pl. Ex. 75; Rios Decl. ¶ 5.
4 Sims asserts that he is a union officer and not a steward, and is thus not required to report time spent on
5 union activities to his supervisor. Pl. Ex. 11. His supervisor, Gerardo Rios, asserts that Sims is a union
6 steward, and was asked to report his time in accordance with the collective bargaining agreement. Rios
7 Decl. ¶¶ 4-5. Sakamoto asserts this was retaliation against Sims due to his union activity on her behalf;
8 she further claims that this retaliation extends to her since she fears that more action will be taken
9 against him if she continues to seek his help. Sakamoto Decl. ¶¶ 97-101.

10      Regardless of Sims' exact union role and title, Sakamoto does not have standing to bring this
11 claim due to lack of injury. While retaliation against an employee for siding with a coworker in a
12 discrimination case is illegal, such claims may generally only be brought by the employee who suffered
13 retaliation, not the coworker who received her help. *See, e.g.*, *Johnson v. Harris County Flood Dist.*,
14 869 F.2d 1565 (5th Cir. 1989); *Ross v. Smith*, 837 F. Supp. 803 (D. Miss. 1993); *Stevens v. Stubbs*, 576
15 F. Supp 1409 (N.D. Ga. 1983). The exception to this is found in *Karcher v. Emerson Elec. Co.*, 94 F.3d
16 502 (8th Cir. 1996), in which the Eighth Circuit Court of Appeals allowed a plaintiff to recover on a
17 claim based on reprisal against her husband, who worked for the same employer, after he was
18 discharged due to her filing of a lawsuit against the employer. *See id*. at 508. The *Karcher* court found
19 that the evidence could support a finding that the plaintiff had suffered economic and emotional
20 damages flowing from her husband's discharge. This finding was based on the reduction of benefits
21 she experienced due to fewer benefits available in his new job, and testimony from a psychiatrist that
22 the plaintiff's feelings of responsibility for her husband's discharge had caused her distress and put a
23 strain on the marriage. *See id*. Implicit in *Karcher* is that the injuries extended to the wife because of
24 the marital relationship; since she and her husband constituted an economic and legal unit, retaliatory
25 action against him flowed naturally to her. There is no such relationship here, and the injury alleged
26 by Sakamoto does not rise to the level of that suffered by the *Karcher* plaintiff. The Court declines to
27 extend the *Karcher* holding beyond the context of marriage, as doing so would allow employment
28 discrimination plaintiffs to bootstrap claims that are properly brought only by the truly injured party -

in this case, Sims. Accordingly, the Court shall grant summary judgment to defendants on any claim regarding retaliation against Mark Sims.

### C.    Have Defendants Shown Legitimate, Nondiscriminatory Reasons for Their Actions?

After the plaintiff makes a *prima facie* showing of discrimination, the burden shifts to the employer to produce evidence from which a trier of fact could conclude that its actions were taken for legitimate, nondiscriminatory reasons. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). Defendants have outlined legitimate business reasons for all actions taken regarding Sakamoto.

With respect to the delay in promotion to the GS-13 level, they point to the desk audit that found plaintiff to be working at the GS-12 level at the time she requested her promotion. McGee Dep. at 27:5-29:8. They claim that Fong gave her special assignments after the desk audit designed to enhance her skills, after which she was eventually issued a promotion to GS-13 in December 2001; this undercuts the assertion that Fong must have improperly influenced the desk audit due to his bias. In regards to the removal of the cart from her cubicle, they say that this was due to a fire code violation, which plaintiff admits existed. E-mail messages sent among EPA personnel regarding the removal of the cart indicate that it constituted a violation as well. Pl. Exs. 47-48; Sakamoto Decl. ¶ 54. With regards to Fong's entry into Sakamoto's cubicle, they assert that he visited her only after she responded to the cart removal request by wheeling it into his office and leaving it there, and that Fong in any case regularly visited his subordinates in their cubicles. Fong Decl. ¶ 4. They also assert that Fong approved thirty-six out of the forty-one credit hour requests that Sakamoto made in between June 2003 and January 2005, and that he could not approve the remaining five because Sakamoto refused to tell him what she was planning on working on during those times. Fong Decl. ¶ 7, Ex. C. Fong claims that he was forced to inquire into what she was planning on doing prior to approval because he had previously found that she was performing unnecessary tasks during credit hour time. *Id*. at ¶ 5. As for the letter of reprimand, defendants claim that it was justified because Sakamoto (1) refused to discuss her workload with Fong, (2) improperly requested leave on the morning of a day during which she was scheduled to meet with

Fong and Tom Huetteman, Deputy Director of the Policy Management Division, regarding her refusal to discuss her workload, and (3) brought a tape recorder to a meeting after being told not to do so. Coleman Decl. Ex. J. Finally, they claim that Fong's performance review comments were truthful, and sought only to provide plaintiff valuable feedback on her work performance. Fong Decl. ¶ 6.

Defendants have articulated legitimate, nondiscriminatory reasons for all actions taken against Sakamoto. The stated reasons for the employer action in each of the incidents described above are credible and supported by evidence, particularly in the case of the removal of the cart from Sakamoto's cubicle.

### D.     Can Plaintiff Show That the Proffered Reasons Are Pretextual?

The burden now shifts to Sakamoto to show that the proffered reasons are pretextual. *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 11149-50 (9th Cir. 1997). The required showing remains low, and is particularly low where a plaintiff has established a *prima facie* case through direct or circumstantial evidence of discriminatory intent. In such a case, the plaintiff will nearly always "*necessarily* have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812-813 (9th Cir. 2004). As discussed *supra*, Sakamoto has established her *prima facie* case through such evidence, not through the *McDonnell Douglas* presumption. As such, the Court finds that there remains an issue of material fact on whether there was an improper motive behind Fong's actions, with the exception of the claim involving removal of the cart from her cubicle. The evidence put forth by defendants showing that the reason for this request was entirely legitimate is particularly strong. Plaintiff has submitted a drawing of her office floor plan that purports to show that others in violation were not asked to remove anything, but it is not at all clear to the Court what, if anything, this drawing shows. Pl. Ex. 49. Accordingly, the Court grants summary judgment to defendants with regards to any claim of discrimination or retaliation related to removal of the cart from plaintiff's cubicle, and denies summary judgment for all other claims related to actions in which Fong played a role.

### E.     Has the EPA Fully Responded to Plaintiff's FOIA Requests?

Finally, plaintiff claims that the EPA has violated FOIA in regards to her August 3, 2004 request for copies of all individual weekly work plans submitted to management for employees in her QA office. Johnson Decl. Ex. G.  The EPA responded to this request on August 12, 2004, with responsive documents dating from September 21, 1999 through October 7, 2002, with employee names redacted. The letter indicates that Sakamoto may appeal within thirty days. Johnson Decl. Ex. H. Sakamoto sent an "appeal" on August 19, 2004, which asked whether she had received **all** such work plans (emphasis in original).  Johnson Decl. Ex. I.  She now claims that Fong indicated in his September 27, 2004 deposition that additional documents exist that the EPA improperly withheld from her, forming the basis of her FOIA claim.  An examination of the cited deposition testimony reveals no such statement by Fong.  Pl. Ex. 3.  Plaintiff has submitted no evidence that the EPA has improperly withheld any information in regards to her August 3, 2004 FOIA request.  There is thus no question of material fact, and the Court shall order summary judgment in favor of defendants on the FOIA claim.

### CONCLUSION

Whether or not plaintiff was unlawfully discriminated against, the undisputed facts of this case indicate that the working relationship between Sakamoto and Fong deteriorated markedly over time, due in some measure to Fong's racially tinged and sexist comments.  At a minimum, Fong's statements were unprofessional, and a finder of fact may conclude that they were part of discriminatory conduct.  While trial will likely be difficult for plaintiff, the issues of material fact she has raised on the claims related to Fong are sufficient to entitle her to have them heard by a jury should she so desire.

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion for summary judgment with regards to claims associated with the letter from Jane Diamond, discrimination by Terry Stumph, retaliation against Mark Sims, removal of the cart from plaintiff's cubicle, and the FOIA claim. The Court DENIES defendants' motions in all other respects. In addition, the Court DENIES plaintiff's motion for summary judgement (Docket Nos. 237, 249, 257).

**IT IS SO ORDERED.**

Susan Illston

Dated: July 24, 2006

                                                SUSAN ILLSTON
                                                United States District Judge